

**SO ORDERED.**

**SIGNED this 19 day of February, 2021.**

*Stephani W. Humrickhouse*
**Stephani W. Humrickhouse**
**United States Bankruptcy Judge**

---

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF NORTH CAROLINA
## WILMINGTON DIVISION

IN RE:                                        CASE NO. 19-04309-5-SWH
                                              CHAPTER 11
PORTERS NECK COUNTRY CLUB, INC.,
      DEBTOR


PORTERS NECK LIMITED, LLC,                    AP NO. 20-00002-5-SWH
      Plaintiff,

v.

PORTERS NECK COUNTRY CLUB, INC.,
      Defendant.


### ORDER REGARDING MOTION TO DISMISS

The matter before the court in this adversary proceeding is the motion to dismiss filed by the

defendant, Porters Neck Country Club, Inc. ("PNCC"), to which plaintiff Porters Neck Limited, LLC

("PNL") filed a response in opposition.   A hearing on the motion took place in Wilmington, North

Carolina on November 10, 2020, but did not conclude on that date due to a series of unexpected

logistical challenges. The hearing was reconvened by video conference on November 12, 2020.  At

the conclusion of the video hearing, the court dismissed two of the five counts in the complaint:

Count 1, based on the Rooker-Feldman doctrine, and Count 5, asserting a claim of constructive trust. The court took the remaining aspects of the motion under advisement. For the reasons that follow, the court will allow the motion to dismiss as to Count 2 (funds not part of the estate) and Count 3 (constructive fraud). The court will conditionally deny the motion to dismiss as to Count 4, which asserts a claim for embezzlement, subject to further briefing by the parties, as is set out below.

## PROCEDURAL HISTORY

PNCC filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on September 19, 2019. On Schedule E/F, PNCC listed a disputed debt in an unknown amount arising out of a lawsuit filed by PNL against PNCC on August 4, 2014, in New Hanover County Superior Court. Dkt. 24. At issue in that lawsuit (the "State Court Action") were PNL's claims for breach of contract, recovery of property, injunctive relief, unfair and deceptive trade practices, and punitive damages, arising from what PNL alleges to be PNCC's unlawful retention of PNL's share of the proceeds from PNCC's sale of PNL's memberships in Porters Neck Country Club.

In its complaint, PNL alleges that "[i]n blatant violation of the 2004 Turnover Agreement and subsequent amendments thereto, Defendant unilaterally stopped paying Plaintiff for the sale of Plaintiff's memberships in the Club. At the time of doing so, Defendant told Plaintiff that Defendant was escrowing Plaintiff's proceeds in the law firm trust account of Gary Shipman of Shipman & Wright, LLP." Complaint, ¶ 22 (Dkt. 1). PNL goes on to recount the nature of the numerous hearings conducted and discovery undertaken in the State Court Action, as well as the specifics of certain particularly significant orders entered by the state court judges. *Id.* at ¶¶ 23-28 & Exs. D-J. These include but are not limited to the order entered by Judge Gorham on August 20, 2019 (the

2

"Sanctions Order"), which granted sanctions against PNCC for, among other things, violations of the court's discovery orders.  As PNL recites in its complaint:

> Those sanctions included the extraordinary remedy of: (i) dismissing with prejudice and striking Defendant's Answer, Affirmative Defenses, and Counterclaim; (ii) granting judgment as to liability on Plaintiff's claims in favor of Plaintiff; (iii) ordering "all of the subject escrowed funds held by Defendant" to be immediately released and paid to Defendant within thirty days of entry of the order; (iv) leaving issues related to any and all claims of recovery by Plaintiff for trial including all damages, sanctions, interest, and/or attorneys' fees and costs that Plaintiff may be entitled [sic]; and (v) retaining 'jurisdiction to determine future matters and preside over all aspects of this action as the undersigned deems warranted.'

*Id.* ¶ 25d.  PNCC moved for reconsideration of the Sanctions Order, which was denied in an order entered on August 27, 2019 (the "Second Sanctions Order").  In the Second Sanctions Order, Judge Gorham wrote that "[t]he Sanctions Order appropriately granted judgment as to liability on Plaintiff's claims.  Accordingly, those funds being escrowed by Defendant have been determined as a matter of law to belong to Plaintiff, and Defendant was afforded all necessary and appropriate due process related thereto."  *Id.* (Complaint, Ex. J at 5-6).  PNCC appealed both the Sanctions Order and the Second Sanctions Order on September 13, 2019, and it filed its chapter 11 bankruptcy petition on September 19, 2019.  *Id.* ¶¶ 26-29.

With regard to the "escrowed funds," PNL alleged in its complaint that during the debtor's section 341 creditors' meeting on October 24, 2019, PNL learned for the first time that notwithstanding multiple and repeated "representations and assurances to the New Hanover County Superior Court and Plaintiff," in fact, the debtor had "not fully escrowed the proceeds from the sales of Plaintiff's memberships."  Instead, PNL alleges,

> [a]fter Defendant filed the underlying bankruptcy case, Plaintiff also learned (during the aforementioned 341 meeting) that Defendant took the funds that were in the trust account of Shipman & Wright, LLP – approximately $518,614.99 – and deposited them into Defendant's operating account on or about April 15, 2019. The

3

aforementioned escrowed funds were used for Defendant's general business operations. The withdrawal and spending of the funds held in the Shipman & Wright, LLP firm trust account was done without the knowledge or consent of Plaintiff, nor with any notice whatsoever to the Plaintiff or the Court in the Breach Lawsuit and in direct contravention of the countless representations by the Defendant, its agents, officers, deponents and attorneys.

On or about August 27, 2019, Defendant re-deposited $518,614.99 into the Shipman & Wright, LLP firm trust account.

*Id.* ¶¶ 31-33 (internal paragraph numbering omitted). In other words, PNL contends that at the time the Sanctions Order was entered, there were *no* sales proceeds in the Shipman & Wright, LLC trust account, having been withdrawn months before and used by PNCC for general business operations. Again according to PNL, PNCC subsequently made a deposit[1] into the trust account in an amount equal to the sum it previously had withdrawn, which it did on or around the date the Second Sanctions Order was entered.

In its bankruptcy case, on October 2. 2019, PNCC filed a Notice of Disputed Claim related to PNL's claim arising from the sanctions order in the State Court Action. Bkcy. Dkt. 22. On January 2, 2020, PNL initiated this adversary proceeding, asserting five claims for relief:

Count 1: The Sales Proceeds From the Sale of Plaintiff's Memberships Are Not Property of Defendant's Bankruptcy Estate (Rooker-Feldman doctrine)

Count 2: The Sales Proceeds From the Sale of Plaintiff's Memberships Are Not Property of Defendant's Bankruptcy Estate (11 U.S.C. § 541)

Count 3: Constructive Fraud

Count 4: Embezzlement (N.C. Gen. Stat. § 14-90)

Count 5: Constructive Trust

---

[1]Based upon previous hearings in this proceeding and in connection with the underlying bankruptcy case, it is the court's understanding that this second deposit into the trust account consisted of hurricane insurance funds paid to PNCC by its insurer.

In its motion to dismiss the complaint, PNCC seeks dismissal of all five counts for failure to state a claim upon which relief may be granted pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, made applicable here by Federal Rule of Bankruptcy Procedure 7012. The court turns now to the merits of the motion.

## DISCUSSION

In ruling on a motion to dismiss for failure to state a claim, the court accepts as true the factual allegations in the plaintiff's complaint, and construes those facts in the light most favorable to the plaintiff. Dismissal of a cause of action is appropriate "only if it appears beyond doubt that the plaintiff ... can prove no set of facts in support of [the] claim that would entitle [plaintiff] to relief." *Jackson v. Blue Dolphin Commc'ns of N.C.*, 226 F. Supp. 2d 785, 788-89 (W.D.N.C. 2002). Put another way, "[t]o survive a motion under Fed. R. Civ. P. 12(b)(6), a complaint need only outline a recognized legal or equitable claim which sufficiently pinpoints the time, place, and circumstances of the alleged occurrence and which, if proven, will justify some form of relief." *Id.* at 789. The complaint "should not be dismissed unless it clearly appears that plaintiff can show no set of facts which would entitle him to relief." *DirecTV, Inc. v. Tolson*, 498 F. Supp. 2d 784, 800 (E.D.N.C. 2007).

That standard does not extend, however, so far as to require the court to "accept the legal conclusions drawn from the facts [or] ... unwarranted inferences, unreasonable conclusions, or arguments." *Id.* (quoting *Eastern Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 180 (4th Cir. 2000)). Instead, the court may "eliminate actions that are fatally flawed in their legal premises." *Id.* (quoting *Parham v. Pepsico, Inc.*, 927 F. Supp. 177, 178 (E.D.N.C. 1995)). And, in construing claims that arise under state law, it is well established that the court applies North

Carolina substantive law.  The "'basic federal rule' in bankruptcy is that state law governs the substance of claims." *Raleigh v. Illinois Dept. of Revenue*, 530 U.S. 15, 20 (2000); *see also Butner v. United States*, 440 U.S. 48, 54-55 (1979) (noting that property interests "are created and defined by state law").  The court will address each of the five claims in turn.

## I.     Count 1: The Sales Proceeds From the Sale of Plaintiff's Memberships Are Not Property of Defendant's Bankruptcy Estate (Rooker-Feldman doctrine)

PNL argues that this court has no jurisdiction to determine the liability of the debtor to PNL under the Subscription Agreement, or to consider whether the funds put aside by the debtor and maintained by its counsel are property of the debtor, because those issues have been finally determined in state court such that application of the Rooker-Feldman doctrine precludes this court from exercising jurisdiction over them.  In making this argument, PNL acknowledges that the "Supreme Court has described the pattern of cases to which the Rooker-Feldman doctrine applies as follows: 'The losing party in state court file[s] suit in U.S. District Court[2] after the state proceedings [have] ended, complaining of an injury caused by the state-court judgment and seeking federal-court review and rejection of that judgment.'" PNL Mem. at 8 (quoting *Skinner v. Switzer*, 562 U.S. 521, 531 (2011)).

Here, it is undisputed that the state proceedings have not ended, and that PNCC has not filed suit in federal court to seek review of or otherwise challenge either of the sanctions orders; nonetheless, PNL maintains that the doctrine still applies because PNCC "lost" on the issue of liability and is "using the bankruptcy to get around the state court order and appellate process to

---

[2] Discussions of the doctrine typically refer to its application to the ability of federal district courts to exercise subject matter jurisdiction, but there is no question that the doctrine equally applies to bankruptcy courts.

prevent PNL from obtaining the funds that was [sic] ordered to be transferred to PNL." *Id.* at 10. This, PNL reasons, would "render a state court order ineffectual," and subject the Sanctions Orders to federal review, both of which are precluded by the doctrine. *Id.*

PNCC counters that here, the required factual and procedural posture is simply not present, and argues that it has not asked this court to sit in review of any state court final judgment because there isn't one: instead, its challenge to the state court orders is pending before the North Carolina Court of Appeals. PNCC Mem. at 10. PNCC argues further that PNL's invocation of the doctrine is in reality an attempt to raise arguments based on issue preclusion or collateral estoppel, which are rooted in concepts that are "distinctly different from a *jurisdictional* challenge pursuant to the Rooker-Feldman doctrine." *Id.* at 11-13 (emphasis added).

Distilled to its essence, the Rooker-Feldman doctrine "holds that 'lower federal courts are precluded from exercising appellate jurisdiction over final state-court judgments.'" *Thana v. Board of License Comm'rs for Charles County*, 827 F.3d 314, 319 (4th Cir. 2016)*, quoting Lance v. Dennis*, 546 U.S. 459, 464 (2006). In *Thana*, the Fourth Circuit reviewed in detail the Supreme Court decisions from which the doctrine takes its name – *Rooker v. Fiduciary Trust Co.* in 1923, and *D.C. Court of Appeals v. Feldman* in 1983 – and the gradual expansion of the doctrine since then, including the Supreme Court's most significant modern analysis, set forth in *Exxon Mobile Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005).

Construing *Exxon* and its predecessors, the *Thana* court explained how, over the years, it and many other courts increasingly had "broadly interpreted the doctrine as barring the loser in a state court adjudication 'from bringing suit in federal court alleging the same claim or a claim that could have been brought in the state proceedings,' thereby sliding the analysis into an application of claim

7

preclusion principles." *Thana*, 827 F.3d at 319.  It was this overly expansive application of the doctrine that was narrowed by the Supreme Court in *Exxon*, wherein the Court very pointedly corrected course: "The Rooker-Feldman doctrine ... *is confined to cases of the kind from which the doctrine acquired its name*: cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Exxon*, 544 U.S. at 284 (emphasis added); *see also Thana*, 827 F.2d at 320 (discussing the *Exxon* Court's clarification of doctrine); *Livingston v. North Carolina State Bar*, 364 F. Supp. 3d 587, 593 (E.D.N.C. 2019) (noting that "Rooker-Feldman is a 'narrow doctrine'" and quoting *Lance v. Dennis*, 546 U.S. 459, 464 (2006)).

Moreover, the state court judgment must be *final*.  As the *Thana* court explained,

> if we apply strictly the Supreme Court's instruction that the Rooker-Feldman doctrine is to be "confined to cases of the kind from which the doctrine acquired its name," ... we would conclude that the doctrine does not apply here because the district court here was not called upon to exercise appellate jurisdiction *over a final judgment from "the highest court of a State in which a decision could be had," ... as was the case in both Rooker and Feldman.*  In those cases, instead of seeking review in the Supreme Court of a judgment entered by the State's highest court, the losing party pursued review of the judgment in a federal district court, frustrating the Supreme Court's exclusive jurisdiction over such a judgment. ... Obviously, the case before us does not fit that profile.

*Thana*, 827 F.3d at 321 (internal citations and some text omitted) (emphasis added). Notwithstanding the requirement of a final order, PNL argues that under *Friedman's, Inc. v. Dunlap,* the Rooker-Feldman doctrine can "also preclude review of adjudications by *lower* state courts," as well as adjudications of the highest state appellate court.  *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 196 (4th Cir. 2002) (emphasis added).  In *Dunlap*, the court did hold that "the fact that the decision of a state court is winding its way through the state appellate system does not subject it to federal review in the meantime." *Id*. at 196.  *Dunlap*, however, is not persuasive because it predates the

*Exxon* Court's more restrictive view of the doctrine, and is quite clearly at odds with the Fourth Circuit's recent decision in *Thana*. *See also Reaves v. American Home Mortgage Svcg., Inc*., 2017 WL 9478517, No. 5:15-VC-180-FL (E.D.N.C. Aug. 21, 2017) ("It is unclear whether *Dunlap* remains controlling on this point after *Exxon* and *Thana*."); *but see Livingston*, 364 F. Supp. 3d at 593 (citing *Brown & Root, Inc. v. Breckenridge*, 211 F.3d 194, 199 (4th Cir. 2000) for proposition that doctrine encompasses "not only review of adjudications of the state's highest court, but also the decisions of its lower courts").  Under the controlling precedent of *Exxon* and *Thana*, this court likewise sees *Dunlap* as being on shaky ground, given that it sets out precisely the sort of expansive interpretation that those cases warn against.

Finally, it appears to the court that in invoking Rooker-Feldman, what PNL really seeks to do is simply protect its interpretation of the content and application of the two Sanctions Orders. This blurring of the boundaries between preclusion principles and the jurisdictional precepts upon which Rooker-Feldman is based is not uncommon: as the *Thana* court explained, discussion of the doctrine often comes up when the true issue at hand isn't jurisdictional in nature, but rather is based on issue or claim preclusion:

> To be sure, the distinction between preclusion principles and the Rooker-Feldman doctrine can sometimes be subtle, but it is nonetheless important to maintain. Preclusion principles are designed to address the tension between two concurrent, independent suits that results when the two suits address the same subject matter, claims, and legal principles.  Whereas *the Rooker-Feldman doctrine, by contrast, assesses only whether the process for appealing a state court judgment to the Supreme Court under 28 U.S.C. § 1257(a) has been sidetracked by an action filed in a district court specifically to review that state court judgment*.  Thus, if a plaintiff in federal court does not seek review of the state court judgment but instead "presents an independent claim, it is not an impediment to the exercise of federal jurisdiction that the same or a related question was earlier aired between the parties in state court."

*Id.* (quoting *Skinner v. Switzer*, 562 U.S. 521, 532 (2011) (emphasis added) (internal quotation marks and alterations omitted)).  The question of whether and if so to what extent any preclusionary principles may apply in connection with the two Sanctions Orders is not now before this court, and the court does not address it.

The court dismissed this count of the complaint at the conclusion of the November 12, 2020 hearing because it was readily apparent, as a matter of law, that the Rooker-Feldman doctrine is not applicable.  Having determined that it has jurisdiction to do so, the court proceeds to the remaining issues before it.

## II.    Count 2: The Sales Proceeds From the Sale of Plaintiff's Memberships Are Not Property of Defendant's Bankruptcy Estate (11 U.S.C. § 541)

PNL seeks a determination that the monies set aside by PNCC and placed into the trust account of attorney Shipman are not property of the estate, and instead were "escrowed" by PNCC on behalf of PNL.  Escrowed funds, PNL argues, cannot be property of the estate as a matter of law: PNCC counters that the funds were never escrowed in the first place.  The parties agree that whether any of the monies held in the trust account were held in "escrow" is a matter of North Carolina state law.  The court will "begin with the threshold analysis of whether the arrangement presented to the court is a true escrow."  5 *Collier on Bankruptcy*. ¶ 541.09[1] (2016).

As the North Carolina Court of Appeals has pointed out, there unfortunately is a dearth of precedent on the matter:  in 2009, in *Johnson v. Shultz,* that court observed that "our research has failed to yield a single North Carolina case which defines an escrow." *Johnson v. Shultz*, 671 S.E.2d 559, 565 (N.C. App. 2009), *aff'd and remanded*, 691 S.E.2d 701 (2010).  The issue before the *Johnson* court was whether the parties to a residential real estate transaction had created an escrow in connection with the property sale, with the answer to that question determining which party bore

the risk of loss upon the closing attorney's misappropriation of the sale funds. Relying on a leading treatise, the *Johnson* court based its analysis on these precepts:

> An "escrow," as a general rule, is created when the grantor parts with all dominion and control of [an] instrument or money by delivering it to a third person or a depository with instructions to deliver it to the named grantee upon the happening of certain conditions.  It is an instrument which by its terms imports a legal obligation, and which is deposited by the grantor, promisor or obligor, or his agent with a stranger or a third party, the depository, to be kept by him or her until the performance of the condition or the happening of [a] certain event and then to be delivered over to the grantee, promisee, or obligee. *"Escrow" by definition means "neutral," independent from the parties to the transaction.*... Thus, when, pursuant to an agreement, money is left in [the] hands of the attorney or agent of one of the parties, an escrow is not created; however, in some jurisdictions, one may be the escrow agent of both parties to an escrow if there is nothing inconsistent or antagonistic between his acts for the one and the other.

*Johnson*, 671 S.E.2d at 565 (quoting 28 Am.Jur.2d *Escrow* § 1 (2000) (footnotes omitted)) (emphasis added).  In that case, notwithstanding a series of "conditions" and requirements included in the parties' offer to buy, the *Johnson* court found "the record ... completely devoid of any evidence tending to establish the creation of an escrow between the parties, including any escrow instruction to [the closing attorney] from the buyers (the Shultzes), the sellers (the Johnsons), or the lender."  *Id.* at 566; *see also Weare v. Bennett Bros. Yachts, Inc.*, 2020 WL 398501, at *4-5 (E.D.N.C. 2020) (discussing *Johnson* and concluding that defendant yacht broker was not an "escrow agent" where defendant was the seller's agent rather than a disinterested third party, and the transaction "lack[ed] an agreement instructing defendant on conditions precedent to delivering the balance of the purchase price").

Here, PNL has failed to allege the facts necessary to support a conclusion that an escrow existed. It has alleged only that PNCC has, through its representatives, repeatedly *referred* to PNL's share of the monies received by PNCC for membership sales as being held "in escrow." There is no

dispute that these representations were made, but use of that term does not an escrow make.  As the *Johnson* court made clear, an "escrow" is a creature of contract: there are various types depending on the nature of the transaction, and its necessary elements – such as the grantor parting with dominion and control, delivery to a neutral and independent third party, and the creation and implementation of instructions for delivery to the grantee – generally are embodied in a written agreement, which sets out the escrow instructions and any conditions applicable to the parties' arrangement.  *Johnson*, 671 S.E.2d at 565-66.

Here, the facts as alleged by PNL, taken in the light most favorable to it, can satisfy none of those factors.  To the contrary, PNL alleges that PNCC *did not* part with dominion or control over the sales proceeds, and instead *unilaterally*, and *without authorization*, elected to deposit them into *its own attorney's trust fund*.[3]  PNL does not allege that attorney Shipman could or did serve as a neutral and independent third party, as is required to effectuate an escrow agreement; instead, PNL elsewhere contends the opposite, arguing that attorney Shipman acted in league with PNCC's representatives in various ways to the frustration of PNL's legitimate business interests.  As in *Johnson*, albeit here in the context of a motion to dismiss, the factual contentions before the court are completely devoid of any basis upon which the court could conclude that any type of escrow existed.

---

[3] In a related adversary proceeding, *Porters Neck Limited, LLC v. Robin Vinson, et al.* (A.P. No. 20-00143-5-SWH), PNL identifies the account as the "Shipman & Wright unilateral and unauthorized escrow account."  First Amended Complaint (Dkt. 1-3) at pp. 10-13.  PNL further alleges that attorney Shipman, together with others, sought to obstruct justice and "engaged in malicious, corrupt, and/or deliberate misconduct" with regard to PNCC's business relationship with PNL and the related litigation, including commingling of the "PNL's Shipman and Wright unilateral and unauthorized escrow account" with PNCC's operating account(s).  *Id.* at 13.

Moreover, and perhaps more importantly, it is undisputed that at the time of the filing of the petition, the funds on hand in the purported "escrow" account were not traceable to or derived from the sale of PNL's memberships. Instead, they appear to be PNCC's hurricane insurance proceeds. PNL itself alleges that sales proceeds in the amount of $518,614.99 initially held in the Shipman & Young trust account were unilaterally withdrawn by PNCC in April of 2019. PNL alleges further that PNCC deposited these monies in its own operating account, then used them for "general business operations." Complaint at ¶ 32. PNL alleges further that some months later, in August of 2019, PNCC deposited an equivalent amount ($518,614.99) into the trust account. It is readily apparent on the facts *as alleged by PNL* that even if the sale proceeds originally *were* held in an actual escrow (which they were not), that escrow would have ceased upon the withdrawal of those proceeds; and, further, that PNCC's subsequent deposit into its attorneys' trust account of new monies created a new fund, which clearly constitutes property of the estate. The court cannot conclude from the facts alleged that an escrow account ever existed, such that § 541 could preclude the monies deposited by PNCC into the Shipman trust account from becoming property of the estate. Accordingly, Count 2 will be dismissed.

## III.    Count 3: Constructive Fraud

An essential element of a cause of action for constructive fraud is a relationship of trust or confidence. More specifically, the claim "must allege (1) a relationship of trust and confidence, (2) that the defendant took advantage of that position of trust in order to benefit himself, and (3) that plaintiff was, as a result, injured." *White v. Consol. Planning, Inc.*, 603 S.E.2d 147, 156 (N.C. App. 2004) (internal citations omitted). In support of its claim, PNL contends that the required "relationship of trust and confidence existed between Plaintiff and Defendant *with respect to the*

*escrowing of proceeds*," and that it was "*caused by the agreements* between the parties, *and Defendant's representations to Plaintiff and the New Hanover Superior Court during the five years that the Breach Lawsuit was being litigated* that Defendant was escrowing sale proceeds of Plaintiff's memberships in the Shipman & Wright, LLP firm trust account." Complaint at ¶¶ 55, 56 (emphasis added).

The court has reviewed the operative documents and "agreements between the parties," and they include no language that requires, or is even indicative, of a relationship of "trust and confidence." Nor does the parties' prolonged performance of these agreements support such a finding. It is undisputed that for approximately 20 years, that relationship was prescribed by contractual provisions that specify the parties' respective obligations. Like any other contract, its terms give rise to the basic expectation that those terms will be satisfied, but it goes no farther than that. If PNL had at any time sought to have PNCC act as its fiduciary, or for their relationship to take on any confidential aspects above their bare contractual obligations, PNL could have negotiated for that, but it did not.

Further, the court cannot possibly conclude that a confidential or trust relationship somehow *arose from the protracted litigation between these parties*. PNL's grievance is that PNCC said one thing and did another, and/or made representations that PNL now contends were untrue or misleading, in the context of a lawsuit between them. Even taking all that to be true, there is simply nothing about it that could permit the court to accept PNL's argument that these events gave rise to a relationship of trust and confidence between PNL and PNCC, which is required element of this claim. Instead, the factual allegations set out by PNL establish the oppositional and "give-and-take" nature of the parties' business dealings. The court concludes that the facts alleged by plaintiff,

14

construed in the light most positive to it while remaining safely within the bounds of reason, cannot as a matter of law establish the elements of constructive fraud. Count 3 will on that basis be dismissed.

**IV.    Count 4: Embezzlement (N.C. Gen. Stat. § 14-90)**

At this stage of this proceeding, in the context of a motion to dismiss, the embezzlement claim can withstand PNCC's motion subject to further review by the court, as described below. The court disagrees with PNCC that there is no civil claim for embezzlement in the state of North Carolina, because there very clearly is: N.C. Gen. Stat. § 1-538.2 provides that a party may pursue a civil action for damages, including consequential damages, for embezzlement that is punishable under N.C. Gen. Stat § 14-90, "regardless of whether a criminal action is brought or an criminal conviction is obtained." Section 14-90 provides that embezzlement of property received by virtue of office or employment is a felony.

To set out a claim for civil embezzlement under § 14-90, a plaintiff must allege that the defendant is a person under § 14-90, who has embezzled or fraudulently or knowingly and willfully misapplied, or converted to his own use, any money that "belongs to" any other person or corporation. N.C. Gen. Stat. § 14-90; *see also, e.g.*, *In re Mason*, 2017 WL 1628889 (Bankr. W.D.N.C. 2017), *quoting State v. Parker*, 756 S.E.2d 122, 124 (N.C. App. 2014); *State v. Murphy*, 567 S.E.2d 442 (N.C. App. 2002). A "person" within the meaning of § 14-90 may include an "agent," and an "agreement to collect funds for a party[ ] and remit those funds less a commission is sufficient to establish an agency relationship for purposes of N.C. Gen. Stat. 14-90." *Mason,* 2017 WL 1628889, at *5, *quoting State v. Newell*, 657 S.E.2d 40, 43 (N.C. App. 2008).

Here, construing the facts in the light most favorable to PNL, the court will not at this time dismiss this claim for three reasons: 1) the allegations can show that PNCC acted as PNL's *agent* in connection with the 2004 Subscription Agreement; 2) the court's review of the applicable state law (and federal courts' interpretations of that law) discussing the parameters of an embezzlement claim indicates that those parameters are extremely murky; and 3) although the economic loss theory may bar the claim, the parties have not yet had an opportunity to brief the issue. It may also be that PNL's inability to allege facts sufficient to establish a fiduciary, confidential, or other trust relationship will preclude PNL's embezzlement claim; the court is likewise doubtful that PNL's allegations with respect to PNCC's "assurances" that the sale proceeds were in escrow and failure to release the funds to PNL upon demand ultimately will be sufficient to satisfy the intent aspect of an embezzlement claim. Doubt, however, will not defeat this claim in the context of a motion to dismiss.

The court's analysis raises a related question of law that should be addressed at this juncture, which is this: Embezzlement is generally understood to be a *tort* claim, and the parties' dispute in this proceeding rests on the alleged breach by PNCC of the parties' *contract*, pursuant to which PNL seeks money damages. The court is well aware that PNL's complaint in *this* proceeding does not specifically set out a claim for breach of contract: however, in its motion to consolidate (Dkt. 30, "Consolidation Motion"), PNL seeks to consolidate debtor PNCC's objection to the claim of PNL in the bankruptcy case (Bkcy. Dkt. 345, the "Claims Objection") with this adversary proceeding. PNL argues in that motion that both the Claims Objection and this proceeding involve the same questions of fact: "At its core, [this] Adversary Proceeding results from the breach of the

Turnover Agreement and the proceeds of the sales of memberships pursuant to the same." Consolidation Motion at 5.

Generally speaking, in a factual scenario like this, the economic loss rule provides that to "pursue a viable claim in tort for conduct that is also alleged to be a breach of contract, 'a plaintiff must allege a duty owed to him by the defendant separate and distinct from any duty owed under a contract.'" *Kelly v. Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009) (observing that the rule makes sense, in part, because "parties to a contract do not thereby become each others' fiduciaries" and thus "generally owe no special duty to one another beyond the terms of the contract"(internal citation omitted)).  There is no question but that "North Carolina's state courts have consistently applied the economic loss rule to hold that purely economic losses are not recoverable under tort law, particularly in the context of commercial transactions." *Crescent University City Venture, LLC v. Trussway Mfg., Inc*., 852 S.E.2d 98, 104 (N.C. 2020).

In light of the foregoing, it is the court's belief that application of North Carolina law may require the court to consider whether application of the economic loss rule precludes PNL from seeking recovery in tort for a breach of contract.  In hopes of focusing the issues in this proceeding and in the underlying bankruptcy case, the court will require that the parties provide briefs to the court addressing the questions of whether the economic loss rule applies in this matter and, if so, whether the parties' contractual relationship precludes a recovery of economic damages under a tort theory due to application of that doctrine.  The court will hold a hearing on the issue if requested to do so by either party.

## V.     Count 5: Constructive Trust

Count 5 of the complaint sets out an alternative cause of action, in which PNL seeks imposition of a constructive trust on the sale proceeds of PNL's memberships if the court determines that those proceeds are property of the debtor PNCC's bankruptcy estate.  As the North Carolina Supreme Court has explained,

> [a] constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty, or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the trust.

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC,* 723 S.E.2d 744, 751 (N.C. 2012). In its memorandum in opposition to dismissal, PNL itself make the point that "[t]he key to the claim is the manner in which the defendant *acquired* the property." PNL Mem. at 20 (emphasis added), *citing Graham v. Martin*, 561 S.E.2d 583, 587 (N.C. App. 2002).  In addition, "[c]onstructive trusts ordinarily arise from actual or presumptive fraud and usually involve the breach of a confidential relationship."  *Fulp v. Fulp*, 140 S.E.2d 708, 711 (N.C. 1965) (emphasis added); *see also In re Welch*, 2012 WL 4846540, at *2-3 (Bankr. E.D.N.C. Oct. 10, 2012) (quoting *Fulp*).

This count was dismissed by the court at the conclusion of the November 10, 2020 video hearing because the facts as alleged by PNL cannot support the conclusion that PNCC *wrongfully acquired* the monies that PNL seeks to recover, which is a necessary element of the claim.  *Variety Wholesalers,* 723 S.E.2d at 751; *see also Fulp*, 140 S.E.2d at 711 ("A constructive trust ... arises when one obtains the legal title to property in violation of a duty he owes to another."). Instead, the uncontested evidence makes clear that PNCC *properly* obtained those sale proceeds, pursuant to the parties' contract.  And, as was discussed earlier, PNL has not alleged facts sufficient to show the

18

existence of a confidential relationship between PNL and PNCC, the wrongful breach of which would be necessary to establish grounds for a constructive trust. Because there is no dispute that PNCC had the right to acquire the membership sale proceeds pursuant to the contract's terms, and lacking any evidence sufficient to establish a confidential relationship, the remedy of a constructive trust is unavailable to PNL as a matter of law.

## CONCLUSION

For the foregoing reasons, defendant's motion to dismiss Counts 1, 2, 3, and 5 of the plaintiff's complaint is ALLOWED and those counts are DISMISSED.

With respect to the remaining cause of action asserted in the complaint, which is the claim of embezzlement set out in Count 4, defendant's motion to dismiss is CONDITIONALLY DENIED, subject to the court's entry of an order setting out a final disposition of that claim, which it will do subsequent to the parties' submission of briefs on the economic loss rule as provided above. Those briefs are to be filed by both PNL and PNCC on or before March 8, 2021.

After review of those materials, the court will enter a supplemental order finalizing its disposition of Count 4, and will at that time enter orders on the pending Consolidation Motion, on PNL's Motion to Reconsider Amended Order Regarding Briefing on Estoppel (Dkt. 46), and on the remaining discovery issues as outlined in the parties' Report of Discovery Conference Per Rule 26(f) (Dkt. 50). A determination of the motion to dismiss will impact the pending motion to consolidate because a complete dismissal of the adversary proceeding would render the Consolidation Motion moot. In turn, the scope of discovery may be affected, especially in light of PNCC's position that equitable estoppel precludes the expanded discovery sought by PNL.

## END OF DOCUMENT

19